# UNITED STATES BANKRUPTCY COURT
## DISTRICT OF DELAWARE

------------------------------------------------------------X

In re:     :

BUTLER SERVICES     :
INTERNATIONAL, INC., *et al.*,[1]     :

             Debtors. :

------------------------------------------------------------X

Chapter 11

Case No. 09-_____ ( )

(Joint Administration Requested)

**MOTION PURSUANT TO BANKRUPTCY CODE SECTIONS 105, 363, AND 365
AND BANKRUPTCY RULES 2002, 6004, AND 6006 (I) (A) APPROVING
PROCEDURES IN CONNECTION WITH SOLICITING BIDS FOR A SALE OF
SUBSTANTIALLY ALL OF THE DEBTORS' ASSETS, (B) AUTHORIZING THE
DEBTORS TO ENTER INTO A STALKING HORSE AGREEMENT IN
CONNECTION WITH THE SALE OF THE ASSETS, (C) APPROVING
CERTAIN BID PROTECTIONS IN CONNECTION THEREWITH, (D)
APPROVING THE FORM AND MANNER OF SALE NOTICE, AND (E)
SCHEDULING AUCTION AND SALE HEARING DATES; (II) APPROVING
THE SALE OF THE ASSETS FREE AND CLEAR OF ALL INTERESTS; (III)
ASSUMPTION AND ASSIGNMENT OF ASSUMED CONTRACTS; AND (IV)
GRANTING RELATED RELIEF**

The above-captioned debtors and debtors in possession (each a "Debtor" and collectively,

the "Debtors"), by their undersigned counsel, hereby move this Court, pursuant to sections 105,

363, 365 of chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (the

"Bankruptcy Code") and rules 2002, 6004, and 6006 of the Federal Rules of Bankruptcy

Procedure (the "Bankruptcy Rules"), for the entry of two orders: <u>one order</u>, substantially in the

form annexed hereto as Exhibit A (the "Bidding Procedures Order") (A) approving procedures in

connection with soliciting bids (the "Bidding Procedures"), a copy of which is annexed hereto as

---

[1] The Debtors in these cases, along with the last four digits of each of the Debtor's federal tax identification number, are: Butler Services International, Inc. (1282); Butler International, Inc. (4321); Butler of New Jersey Realty Corp. (7593); Butler Service Group, Inc. (2289); Butler Publishing, Inc. (1211); Butler Telecom, Inc. (3416); Butler Utility Service, Inc. (8023); Butler Services, Inc. (5420); and Butler Resources, LLC (3504).

Exhibit B, for a sale (the "Sale") of substantially all of the Debtors' assets (the "Purchased Assets"), as more specifically described in the Asset Purchase Agreement (the "Agreement")[2] with Butler America LLC ("Butler America" or "Purchaser"), annexed hereto as Exhibit D, free and clear of all claims (as defined in section 101(5) of the Bankruptcy Code) and any other interests, liens, mortgages, pledges, security interests, rights of first refusal, obligations and encumbrances of any kind whatsoever (collectively, "Interests"), (B) authorizing the Debtors to enter into the Agreement in connection with the Sale of the Purchased Assets, (C) approving certain bid protections in connection therewith, (D) approving the form and manner of notice of the Sale, a copy of which is annexed hereto as Exhibit C (the "Sale Notice"), (E) scheduling Auction and Sale Hearing dates (each as defined herein), (F) establishing notice procedures for the assumption and assignment of certain executory contracts (the "Contracts") and unexpired leases (the "Leases"), and (G) granting related relief; and a second order, substantially in the form annexed hereto as Exhibit E (the "Approval Order"), (A) approving the Sale of the Purchased Assets free and clear of all Interests, (B) approving the assumption and assignment of Contracts and Leases (collectively, the "Assumed Contracts"), and (C) granting related relief. In support of the Motion, the Debtors respectfully represent as follows:

## PRELIMINARY STATEMENT

1.    For the reasons set forth below, it is critical that the sale process be concluded expeditiously. For one thing, if the order approving the sale is not entered by July 1, 2009, Butler America, the stalking horse bidder, can terminate the Agreement. Equally important, any delay will cost the estates substantial monies. Subject to certain limitations described in the Agreement, the ultimate sale price to be paid by Butler America under the Agreement includes

---

[2]    Terms not otherwise defined herein shall have the meanings given to them in the Agreement.

all of the Debtors' post-petition borrowings under the DIP facility, which the Debtors are seeking approval to enter into simultaneously herewith. However, there is a cap on the sale price under the Agreement (subject to certain exceptions described in the Agreement). If the Sale is not closed in early July, 2009 (the closing is to occur on the earlier of the second (2nd) business day after entry of the order approving the sale and July 10, 2009), the cap will likely be exceeded causing the estates to bear (if there is even funding at all) the costs of any borrowings in excess of the cap.

2.     Thus, the Debtors are requesting herein that the Auction be held on June 25, 2009 and that the Sale Hearing be held on June 26, 2009. Such dates should allow the Debtors to meet the necessary deadlines and monetary constraints.

3.     As noted below, the Debtors business has been extensively marketed pre-petition and an additional extended marketing period would be pointless. Parties interested in bidding on the Debtors' business will have ample opportunity to participate on the time table proposed herein. In order to provide as much notice as possible the Debtors are serving the Sale Notice (with a note indicating the dates that the Debtors' are requesting) on all parties reasonably known to have expressed an interest in a transaction with respect to the Assets during the past nine (9) months, and all parties reasonably known to have asserted any interest in the Assets.

## STATUS OF CASE AND JURISDICTION

4.     On June 1, 2009 (the "Petition Date"), the Debtors each filed voluntary petitions for relief with this Court under chapter 11 of the Bankruptcy Code.

5.     The Debtors are continuing to operate their business and manage their properties as debtors-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. No trustee, examiner or Official Committee of Unsecured Creditors ("Committee") has been appointed in these cases.

6.     In support of their voluntary petitions and "first day" motions, the Debtors filed the Declaration of Richard A. Sebastiao in Support of the Debtors' Chapter 11 Petitions and First Day Relief, dated June 1, 2009, (the "Sebastiao Declaration"). In addition to other customary "first day" motions, pursuant to rule 1015(b) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), the Debtors have filed a motion for joint administration of their chapter 11 cases, which is pending before this Court.

7.     Contemporaneously with the filing of this Motion, the Debtors have also filed a motion requesting this Court authorize them to incur post-petition indebtedness in accordance with a Senior Secured, Super-Priority Debtor-In-Possession Credit Agreement (the "DIP Credit Agreement") with General Electric Capital Corporation ("GECC"), as an agent (in such capacity, the "DIP Agent") and lender (together with any other lenders party thereto, the "DIP Lenders").

8.     This Court has jurisdiction to consider this matter pursuant to 28 U.S.C. § 157 and 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b). Venue is proper before this Court pursuant to 28 U.S.C. § 1408 and 1409.

## BACKGROUND

A.     The Debtors' Business

9.     The Debtors are in the business of providing (i) outsourcing, (ii) project management and (iii) technical augmentation services. The Debtors have been in this business for over 60 years. The Debtors provide these services in three general disciplines in which they have developed expertise, *i.e.*, (i) technical services, (ii) telecommunications services and (iii) information technology services. The Debtors' services are performed either onsite at their client's facility, offsite at a Debtor-established facility or offshore at a facility located in Hyderabad, India. The Debtors are a people based business largely dependent upon their employees to deliver their services.

10.     Outsourcing services, which are typically delivered at an offsite facility established by the Debtors for this purpose, generally involve the Debtors managing an entire ongoing operation on behalf of their client, thereby reducing the client's cost and the burden of maintaining that operation.  Project management services generally involve the Debtors assuming responsibility for specifically defined projects.  Depending upon the project, such services may be provided either onsite at their client's facilities or offsite at a Debtor-established facility designed for the client's specific purpose.  Technical staff augmentation services are provided to supplement a client's existing work force with technical professionals who possess skills tailored to the particular needs of the client's business.

11.     Each of these services is provided in three general disciplines: (i) technical services, which involve skilled technical and engineering personnel providing services to companies worldwide competing in a wide range of industries including aircraft/aerospace, defense, heavy equipment/machinery, research, energy, electronics, and pharmaceutical, (ii) telecommunications services, which assist telecommunications equipment manufacturers and service providers upgrade wireless and wireline network infrastructures to support enhanced voice, high-speed data and video services, and (iii) information technology services, which assist companies implement business solutions that harness the power of technology to optimize business performance.

12.     The Debtors also provide fleet services, primarily to certain key telecommunications services clients, which involve customized fleet operations for major ground fleet-holders nationwide.  Additionally, the Debtors provide ideas, strategies and tactics to executive leaders for building more effective organizations through the publication of Chief Executive Magazine.

13.     Butler International, Inc. is a publicly owned entity whose common stock is presently traded on the Pink Sheets. Currently, the Debtors' worldwide corporate headquarters are located in Fort Lauderdale, Florida. As of May 1, 2009, the Debtors maintained approximately 28 office facilities throughout the United States. Such facilities are used predominantly for sales, recruiting and administrative functions. In addition, a non-debtor affiliate maintains an office facility in Hyderabad, India, from which the Debtors provide offshore service delivery. International operations (service delivery occurring in countries outside the United States) accounted for approximately 2% of the Debtors' net sales in fiscal years 2007 and 2008.

### B.     The Debtors' Debt Structure

14.     *Pre-petition Senior Secured Indebtedness.* The Debtors' pre-petition ordinary working capital and general business needs were primarily financed by a senior secured revolving credit facility by and among Butler Service Group, Inc. ("BSG"), as a direct borrower, its Debtor affiliates, as guarantors, and GECC, as agent and lender (together with all amendments, related agreements and documents, the "Pre-petition GECC Agreements"). The Pre-petition GECC Agreements provided a $45,000,000 revolving credit facility, subject to borrowing base limitations, including a $4,000,000 swingline facility. To secure their obligations under the Pre-petition GECC Agreements, the Debtors granted GECC a first priority security interest in, and continuing liens on, all of their assets owned at the time of entry into the Pre-petition GECC Agreements or thereafter acquired, with the exception of Butler New Jersey Realty Corp's ("BNJ") contract rights in real property located at Montvale, New Jersey (the "Montvale Property"), in which GECC has a second priority security interest (collectively, the "Collateral"). As of the Petition Date, the Debtors' aggregate obligation under the Pre-petition GECC Agreements is approximately $20.155 million.

15.     Pre-petition Junior Secured Indebtedness.  To enhance liquidity and provide additional working capital, BSG, as a direct borrower, and each of its affiliated Debtors, as guarantors, were obligated under a $23,000,000 term loan with Monroe Capital Management Advisors, LLC ("Monroe"), as agent and lender (together with all amendments, related agreements and documents, the "Pre-petition Monroe Agreements").  To secure their obligations under the Pre-petition Monroe Agreements, the Debtors granted Monroe a second priority security interest in, and continuing liens on, all of their assets owned at the time of entry into the Pre-petition Monroe Agreements or thereafter acquired, with the exception of BNJ's contract rights in the Montvale Property, in which Monroe was granted first priority security interest.  As of April, 2009, the Debtors' aggregate obligation under the Pre-petition Monroe Agreements was approximately $22 million inclusive of interest.

16.     Intercreditor Agreement.  The relative rights of GECC and Monroe with respect to the Collateral securing the Debtors obligations under the Pre-petition GECC Agreements and the Pre-petition Monroe Agreements are governed by (i) an Intercreditor Agreement dated as of August 29, 2007, between GECC and Monroe (as amended, the "Intercreditor Agreement") and (ii) a certain Mortgage Subordination Agreement dated as of August 29, 2007, between GECC and Monroe, relating to the Montvale Property (as amended, the "Mortgage Subordination Agreement").  Pursuant to the Intercreditor Agreement, GECC and Monroe agreed, *inter alia*, that the liens on the Debtors' assets securing their obligations under the Pre-petition GECC Agreements would be senior and prior to the liens on the Debtors' assets securing their obligations under the Pre-petition Monroe Agreements, with the exception of the liens held by Monroe on the Montvale Property which are senior and prior to the liens held by GECC. Further, pursuant to Section 6.1 of the Intercreditor Agreement, Monroe, *inter alia*, agreed that it

will raise no objection to or oppose a motion to sell the Collateral free and clear of its liens under section 363 of the Bankruptcy Code so long as (i) GECC consents to such sale, and (ii) notwithstanding any debtor-in-possession financing or cash collateral orders, Monroe's liens on the Montvale Property and the proceeds thereof continue to have a first-priority status.

C.     Events Leading to Chapter 11 Filings

17.     In 2008, the Debtors restructured their business from a branch footprint structure to vertical chains by industry. This process resulted in significant internal discontent, which, in turn resulted in the loss of many of the Debtors' valued employees and business with them.

18.     The Debtors also entered into a "not to exceed" contract with one of their customers that ultimately resulted in a significant loss due to performance issues.

19.     The combination of these events over the course of the past year resulted in the Debtors experiencing severe cash shortfalls, which lead to payroll shortfalls to its employees over a two month period in the third quarter of 2008. This lead to a lack of faith in the Debtors by its customers, many of which defected to more stable providers of the Debtors' services.

D.     A Sale is in the Estates' Best Interests

20.     The Debtors believe that a sale of their assets as a going concern is the only viable alternative and is in the best interest of their estates. The Debtors have lost several major customers in the months leading up to their bankruptcy cases, are operating at a loss, and are in a substantial over-advance position with their senior secured lender, GECC. Absent a prompt sale, it is likely, the Debtors' ability to continue to operate as a going concern business will cease based upon employees departing for other companies and customers terminating their contracts with the Debtors. Accordingly, without a fast track sale process to preserve the going concern value of the Debtors, the Debtors may be forced to liquidate at a considerable loss. Conversely, a sale should realize a significantly greater return to their creditors and will preserve the Debtors'

goodwill and enterprise value. It will also create an opportunity for the receipt of higher and better offers.

21.     The Debtors believe that Butler America's offer represents the best available transaction for the Debtors. However, in order to consummate such sale expeditiously (which is necessary both from a business standpoint as the Debtors are operating at a loss and due to the risk of further customer defections or employees securing alternative positions), the Debtors must proceed on an expedited basis. Indeed, given the fact that the Debtors have had experienced difficulties maintaining and preserving customer relationships and employee moral, if the business remains in limbo for an extended period of time in the bankruptcy cases there is a heightened risk of the loss of additional customers and employees. The market for the Debtors' services is extremely targeted and any loss of customers will irreparably reduce its value to the detriment of all creditors. Finally, as discussed in detail below, the Debtors' business has been extensively marketed over a lengthy period before the filing and further marketing efforts would likely only be costly and unproductive. Therefore, the Debtors believe that a prompt auction and sale hearing is both appropriate and essential. Under the bidding procedures which the Debtors seek to have approved, any party who has expressed any interest in the Debtors' assets will have ample opportunity to bid.

        E.      <u>Pre-Petition Efforts to Market the Purchased Assets</u>

22.     The Debtors, with the assistance of their advisors, actively marketed their businesses (as well as considering alternative transactions) for over ten (10) months. The Debtors engaged in discussions with a variety of financial and strategic parties in an effort to maximize the value of the businesses.

23.     Specifically, in June of 2008, the Debtors engaged Venturi & Company ("<u>Venturi</u>") to assist it with identifying transactions by which the Debtors could continue as a

viable enterprise or maximize value to its stakeholders. Through this process, the Debtors, with the assistance of Venturi, identified four types of transactions: (i) selling the business, (ii) refinancing existing debt, (iii) achieving a non-control equity infusion, or (iv) effecting a change of control transaction through a restructuring. Venturi developed discrete financial models and marketing sales memoranda and in July, 2008 began to solicit potential interested parties.

24.    Over the next ten (10) months, Venturi sought to find a party who was willing and able to consummate a transaction with the Debtors. Venturi contacted over 165 parties, sending out over ninety (90) confidentiality agreements, and disseminating over sixty (60) confidential information memorandums to interested parties. During this time, the Debtors' management also made six (6) separate presentations to interested parties.

25.    Venturi again canvassed the market in January and February of 2009 with new (restated) financials and created an electronic data room to facilitate due diligence. During this period the Debtors' management made an additional seven (7) presentations to interest parties. These efforts yielded four (4) indications of interest and the Debtors' received two (2) letters of intent.

26.    To that point, the bulk of the marketing efforts had focused on financial parties, however, after the Debtors' CEO, Ed Kopko, resigned in March 2009, Venturi contacted numerous potential strategic buyers, and received an additional eleven (11) letters of intent. In the aggregate, the Debtors received thirteen (13) letters of intent, nine (9) of which were from strategic parties.

27.    On March 16, 2009, the Debtors signed a letter of intent with an entity related to Butler America, which contemplated that the Debtors would sell substantially all of their assets

to such entity and granted it an exclusive period to conduct further due diligence and secure the necessary financing.

28. However, such party was unable to secure the necessary financing within the exclusive period, which expired in early April, 2009. Venturi at this point contacted interested parties to generate new offers and the Debtors' remaining management made seven (7) additional presentations to such parties. These efforts resulted in the Debtors receiving six (6) new letters of intent, one of which ultimately resulted in the Agreement with Butler America. Before deciding to proceed with Butler America, the Debtors engaged in intense negotiations with many interested parties to explore whether a more attractive transaction might be possible.

29. During the extensive marketing campaign, 223 different parties, which included lenders, private equity firms, and strategic parties, were solicited. Of these parties, 142 parties (twenty-five (25) lenders, eighty (80) private equity firms, and thirty-seven (37) strategic parties) expressed an initial interest and received confidentially agreements; ninety-one (91) parties (nineteen (19) lenders, sixty (60) private equity firms, and twelve (12) strategic parties) executed confidentially agreements and received confidential information concerning the Debtors; the Debtors' management made twenty-one (21) presentations to interested parties; and nineteen (19) parties (eight (8) private equity firms and eleven (11) strategic parties) sent letters of intent to the Debtors, which ultimately resulted in the Agreement attached hereto as Exhibit D.

30. Throughout this comprehensive marketing process, many parties initially expressed interest in entering into a transaction with the Debtors, but such interest diminished over the course of time. This was due in part to the Debtors' shifting financial picture, loss of a key customer, relatively low margins achievable with its current service delivery model, and associated potential declines in demand in the Debtors' end markets. The uncertain overall

economic outlook also played a significant role in diminishing interest in entering into transaction with the Debtors. Due to the continuing decline in the equity markets, certain private equity firms were unable to meaningfully leverage the equity that would be contributed to any transaction and lacked the ability to obtain sufficient working capital on acceptable terms. Other private equity firms with a focus on distressed situations now considered the abundant opportunities to purchase first-lien secured debt at deep discounts to be superior to the potential returns associated with a transaction with the Debtors. Similarly, due to the declining value in their own equity currency and the extremely constrained credit markets, certain strategic partners could no longer fund the transaction and in the case of lenders, could not provide sufficient funds to refinance the Debtors' existing pre-petition debt. Notwithstanding these dismal conditions and the uncertain economic outlook, the comprehensive marketing process was successful – nineteen (19) letters of intent were issued by interested parties, which resulted in Butler America agreeing to serve as a "stalking horse" (the "Stalking Horse Bidder") in these chapter 11 cases and executing the Agreement.

31.     The Debtors believe that any party who may have a bona fide interest in buying the Purchase Assets or consummating an alternative transaction with the Debtors was already solicited through the pre-petition marketing campaign and possesses significant information regarding the Debtors obtained by accessing the electronic data room and /or receiving management presentations. Several of these parties have expressed an interest in bidding at the Auction. Any other party that may possess a bona fide interest in buying the Purchased Assets will also have ample opportunity to submit a bid for such assets. The Debtors have balanced the potential of a higher and better offer other than the Agreement against additional marketing and due diligence time for a prospective purchaser in the bankruptcy cases and believe, in their

business judgment, that the timelines set forth in the Bidding Procedures will maximize value for the Debtors and their creditors without additional loss of customers and employees.

## THE PROPOSED SALE

32.    The Agreement provides for the sale of the Purchased Assets to Butler America, subject to higher or better offers. The principal terms and conditions of the Agreement are as follows:[3]

(a)    <u>Purchase Price</u>. Pursuant to section 2.1 of the Agreement, the Purchase Price consists of cash in the amount of $26,875,000, subject to adjustment.

(b)    <u>Deposit</u>. Pursuant to section 2.1.2(a), Butler America has deposited into an interest bearing account with the Escrow Holder $250,000 (the "Initial Deposit") and will, at least one business day prior to the Bid Deadline, deposit an additional $750,000 into such account (the "Second Deposit" and together with the Initial Deposit, the "Cash Deposit"). The Cash Deposit shall become nonrefundable if the Agreement is terminated by the Debtors pursuant to Section 4.3.6 or 4.3.13 of the Agreement. At Closing, the Cash Deposit (and any interest accrued thereon) shall be credited and applied toward payment of the Purchase Price.

(c)    <u>The Purchased Assets</u>. Pursuant to Section 1.1 of the Agreement, the Purchased Assets consist of, without limitation, all of the Debtors' rights, title and interest in and to:

(i)    *Contracts*. Subject to Butler America's designation rights under Section 1.3 of the Agreement and as described in the applicable schedule accompanying the Agreement, the Debtors' (A) Real Property Leases, (B) Other Leases, (C) Customer Contracts and Customer Information, and (D) Other Leases and Contracts.

(ii)    *Personal Property*. All of the Debtors' Personal Property, except for any equipment or other tangible property held by the Debtors pursuant to a lease, rental agreement, contract, license or similar arrangement for which the underlying contract is not assumed at Closing.

(iii)    *Intangible Property*. All of the Debtors' Intangible Property, provided that, to the extent such Intangible Property cannot be

---

[3]    The following summary is qualified in its entirety by reference to the provisions of the Agreement. In the event of any inconsistencies between the provisions of the Agreement and the terms herein, the terms of the Agreement shall govern. Unless otherwise defined in the summary set forth in the accompanying text, capitalized terms shall have the meanings assigned to such terms in the Agreement.

transferred to Butler America, the Debtors shall be deemed to have granted to Butler America an exclusive, royalty-free right and license to use such Intangible Property from and after the Closing Date, to the fullest extent permitted by applicable law.

(iv)  *Receivables.*  All instruments, receivables, accounts receivable and unbilled costs and fees attributable to the Business or the Purchased Assets and, subject to Section 1.2 of the Agreement, all causes of action relating or pertaining to the foregoing, except for Receivables described in Section 1.1.4 of the Disclosure Letter.

(v)  *Certain Insurance Policies.*  The insurance policies relating to the Purchased Assets or the operation of the Business set forth on Section 1.1.5 of the Disclosure Letter (as may be supplemented from time to time no later than five (5) business days prior to the Bid Deadline), except any recoveries or refunds thereunder with respect to actions or occurrences prior to the Closing Date.

(vi)  *Certain Deposits.*  All of the Debtors' right, title and interest in and to all claims, deposits, prepayments and similar items arising primarily out of, or relating to, the Business or the Purchased Assets, except for those items identified in Section 1.1.6 of the Disclosure Letter.

(vii)  *Permits.*  To the extent transferable pursuant to applicable law, all of the Debtors' right, title and interest in and to all approvals, authorizations, consents, licenses, permits or certificates of a Governmental Authority of the Debtors held in connection with the ownership, lease or operation of the Purchased Assets or the conduct of the Business.

(viii)  *Books and Records.*  All of the Debtors' right, title and interest in and to all books, records, and other documents (whether on paper, computer diskette, tape or other storage media) associated with the Purchased Assets or the operation of the Business.[4]

(ix)  *Cause of Action.*  All of the Debtors' right, title and interest in and to all rights, claims and causes of action against the Debtors' customers or which relate to the Intellectual Property.

(x)  *Stationery.*  All of the Debtors' right, title and interest in and to all stationery, forms, labels, shipping materials, brochures, art work, photographs, advertising materials and any similar items used in the Business.

---

[4]  Pursuant to section 13.1 of the Agreement, the Debtors will have reasonable access to their books and records to enable them to administer their bankruptcy cases.

(xi)     *Non-Debtor Subsidiaries.* All of (A) the Debtors' ownership rights and equity interests in Butler Technical Services India Private Limited and such other Non-Debtor Subsidiaries, if any, as shall be mutually agreed upon among Butler America and the Debtors prior to the Closing and set forth in Section 1.1.11 of the Disclosure Letter, and (B) the organizational documents, record books, copies of Tax and financial records and such other files, books and records of the Debtors relating to the Non-Debtor Subsidiaries to the extent such documents, books, records and files are in the Debtors' possession.

(xii)    *Certain Benefit Plans.* The Benefit Plans and Benefit Arrangements of the Debtors set forth in Section 1.1.12 of the Disclosure Letter (as may be supplemented from time to time no later than five (5) business days prior to the Bid Deadline).

(d)    <u>Excluded Assets</u>. Pursuant to Section 1.2 of the Agreement, notwithstanding anything contrary in the Agreement, the Purchased Assets shall be limited to the items identified or described in Section 1.1 of the Agreement and shall in any event exclude all of the following: (i) those items expressly excluded pursuant to the provisions of Section 1.1 of the Agreement; (ii) all cash or cash equivalents (other than Purchased Deposits and Restricted Cash); (iii) the Debtors' rights under this Agreement and all cash and non-cash consideration payable or deliverable to the Debtors by Butler America pursuant to the terms and provisions the Agreement; (iv) claims and causes of action of the Debtors, other than Assumed Claims; (v) any real property lease, other lease, or other Contract to which any Debtor is a party which is listed or described in Section 1.2.1 of the Disclosure Letter and any Contract that does not become an Assumed Contract pursuant to Butler America's designation rights set forth in Section 1.3 of the Agreement (including, without limitation, any Contract with respect to which fails to become an Assumed Contract as a result of the fact that any consent requirement in favor of the counter-party thereto may not be overridden pursuant to Section 365 of the Bankruptcy Code), (vi) all securities, whether capital stock or debt, of any Debtor or any other entity, other than the Transferred Securities; (vii) all rights and claims in or to any refunds or credits of or with respect to any Taxes, assessments or similar charges paid by or on behalf of any Debtor, in each case to the extent applicable to any period prior to the Closing; (viii) Tax records, minute books, stock transfer books and corporate seals of any Debtor that the Debtors are required by law to retain; provided that, the Debtors shall provide Butler America with reasonable access to, and, at Butler America's sole cost and expense, copies of, any Excluded Asset described in this subclause (viii); (ix) all suits, rights, claims, choses in action and causes of action of any Debtor against any third party, including claims against any current or former officers, directors, employees, members, principals, agents, and representatives of such

Debtor, other than Assumed Claims; (x) subject to applicable law, all preference or avoidance claims and actions of the Debtors arising under Chapter 5 of the Bankruptcy Code; (xi) all instruments, receivables, accounts receivable and unbilled costs and fees outstanding or owing between or among the Debtors (or any entities comprising the Debtors) and all causes of action relating or pertaining to the foregoing, (xii) any assets excluded pursuant to the Approval Order, (xiii) all assets related to or used in the business of Chief Executive Magazine and Butler Publishing Inc.; (xiv) refunds and recoveries under any such insurance policies relating to the Purchased Assets or the operation of the Business; (xv) the real property option related to the real estate located in Montvale, New Jersey, more fully described in Section 1.2(xv) of the Disclosure Letter; and (xvi) those additional assets, if any, listed in Section 1.2 (xvi) of the Disclosure Letter.

(e)     <u>Reasonable Access to Records and Certain Personnel</u>.  Pursuant to section 13.1 of the Agreement, to facilitate the Debtors' efforts to administer and close their bankruptcy cases (including, without limitation, the preparation of filings in such bankruptcy cases and state, local and federal Tax Returns and other filings), for a period of three (3) years following the Closing, (i) Butler America shall permit the Debtors' counsel and other professionals and counsel for any successor to Debtors and their respective professionals (collectively, "Permitted Access Parties") reasonable access upon reasonable notice to the financial and other books and records relating exclusively to the Purchased Assets or the Business and the systems containing such information, books and records, which access shall include (a) the right of such Permitted Access Parties to copy or remove, as applicable, at such Permitted Access Parties' expense, such documents and records as they may request in furtherance of the purposes described above or (b) Butler America's copying and delivering to the relevant Permitted Access Parties such documents or records as they may request, but only to the extent such Permitted Access Parties furnish Butler America with reasonably detailed written descriptions of the materials to be so copied and the applicable Permitted Access Party reimburses Butler America for the reasonable costs and expenses thereof, and (ii) Butler America shall provide the Permitted Access Parties (at no cost to the Permitted Access Parties) with reasonable access upon reasonable notice to Butler America's personnel during regular business hours to assist the Debtors and the other Permitted Access Parties in their post-Closing activities (including, without limitation, preparation of Tax Returns), provided that such access does not unreasonably interfere with Butler America's business operations.  Butler America shall be permitted, as a condition to granting any Permitted Access Party the access to the information afforded by this Section 13.1, to require any Permitted Access Party to execute and deliver to Butler America a confidentiality agreement in form and substance satisfactory to Butler America if any such Permitted

Access Party would, as a result of the foregoing rights, have access to confidential information relating to Butler America's business.

(f)    <u>Break-up Fee / Expense Reimbursement</u>. Pursuant to the bidding procedures attached to the Agreement as Exhibit I, Butler America is entitled to receive a fee of $838,000, which is equal to three percent (3%) of the aggregate Purchase Price set forth in the Agreement (the "Break-Up Fee") (provided that if Butler America has not deposited the Second Deposit with the Escrow Holder, Butler America shall only be entitled to payment of an amount equal to 25% of the Break-Up Fee), plus reimbursement of its reasonable expenses incurred in connection with or related to the Agreement not to exceed $150,000 (the "Expense Reimbursement" and together with the Break-Up Fee, the "Bid Protections").

(g)    <u>Closing Date</u>. Pursuant to section 3.2 of the Agreement, the Closing shall be held upon the earlier to occur of (i) the second (2nd) business day after entry of the Approval Order and (ii) July 10, 2009 (as may be extended by mutual agreement, the "Outside Date").

(h)    <u>Other Deadlines</u>. Pursuant to section 4.3 of the Agreement, the Agreement may be terminated at any time prior to the Closing, including, without limitation:

    (i)    By Butler America, if the Approval Order with respect to the Transactions has been entered and (i) Butler America has provided the Debtors with written notice that it is prepared to consummate the Transactions and (ii) the Closing Date does not occur within four (4) business days of Butler America providing the Debtors with such notice.

    (ii)    By Butler America, if the Bidding Procedures Order shall not have been entered by the Court on or before June 9, 2009.

    (iii)    By Butler America if the Bidding Procedures Order shall not have become a Final Order on or before ten (10) days after entry thereof.

    (iv)    By Butler America, if the Approval Order shall not have been entered by the Court on or before July 1, 2009.

(i)    <u>Request to File Certain Schedules Under Seal</u>. Pursuant to section 11.1.3 of the Agreement, the Debtors shall request (and shall use commercially reasonable efforts to obtain an Order approving such request) that Section 1.1.1-(iii) of the Disclosure Letter and all other sections of the Disclosure Letter, schedules, exhibits and other documents filed with the Bankruptcy Court that include Customer Information or any other trade secret or

confidential research, development, or commercial information be filed under seal pursuant to Section 107(b) of the Bankruptcy Code.[5]

## RELIEF REQUESTED

33.    As noted above, given the Debtors' ongoing loses and fragility, a prompt Sale of the Purchased Assets is the best way (the only way) to maximize the value of such assets for the Debtors' respective estates and creditors.

34.    By this Motion, the Debtors seek entry of the Bidding Procedures Order, substantially in the form annexed hereto as Exhibit A, (A) approving the Bidding Procedures (B) authorizing the Debtors to enter into the Agreement in connection with the Sale of the Purchased Assets, (C) approving the Bid Protections in connection therewith, (D) approving the form and manner of the Sale Notice, (E) scheduling the Auction and Sale Hearing, (F) establishing notice procedures for assuming and assigning Contracts and Leases, and (G) granting related relief. At the Sale Hearing, pending the outcome of the Auction, the Debtors intend to seek entry of the Approval Order (A) authorizing and approving the Sale of the Purchased Assets free and clear of all Interests, (B) authorizing and approving the assumption and assignment of Assumed Contracts, and (C) granting related relief.

A.    Bidding Procedures

35.    As noted above, in order to maximize the value of the Purchased Assets, the Debtors seek to implement a competitive bidding process and sell the Purchased Assets pursuant to the Agreement subject to higher or better offers. The proposed Bidding Procedures are as follows:

(a)    Only "Qualified Bidders," i.e., persons or entities submitting Qualified Bids (as defined herein), and the DIP Lenders, may participate in the Auction. To be considered a "Qualified Bid" for purposes of the Auction,

---

[5]    Contemporaneously with the filing of this Motion, the Debtors have also filed a motion requesting that this Court authorize the Debtors to file certain documents under seal in accordance with section 11.1.3 of the Agreement.

the person or entity submitting the bid must submit an offer, including a proposed purchase agreement, by the Bid Deadline (as defined herein) that includes:

(i)     a redline of the proposed purchase agreement marked against the Agreement;

(ii)    the purchase price, which price must have a value equivalent to that of the Stalking Horse Bid, plus at least the sum of (i) the Break-Up Fee ($838,000.00), (ii) the Expense Reimbursement ($150,000), and (iii) $250,000 (the "Initial Minimum Overbid");

(iii)   the identity of the potential bidder and the officer(s) or authorized agent(s) who will appear on behalf of such bidder;

(iv)   that the bid shall not be conditioned on the outcome of unperformed due diligence by the bidder or any financing contingency;

(v)    a good faith deposit $1,000,000; and

(vi)   that the bidder's offer is irrevocable until the earlier of: (i) consummation of the Debtors' sale of the Assets pursuant to an order of the Bankruptcy Court or (ii) thirty (30) days after the Sale Hearing (as defined herein), but in no event longer than the Outside Date (as defined in the Agreement).

The DIP Lenders and the Debtors' lenders under that certain Third Amended and Restated Credit Agreement, dated as of August 29, 2007 (the "First Lien Lenders") have each reserved their rights to credit bid pursuant to section 363(k) of the Bankruptcy Code and are deemed to be Qualified Bidders for purposes of any Auction.

Except for any credit bid by the DIP Lenders and First Lien Lenders, any person or entity that submits a bid is deemed to have consented to serving as the Alternate Bidder (as defined below) and having its bid considered the Alternate Bid, provided that such bid is determined by the Debtors to be the second highest or otherwise best bid after consultation with the DIP Lenders, the First Lien Lenders, Garrison (as defined herein), Monroe, and the Committee.

(b)    <u>Bid Deadline.</u>  Any person or entity wanting to participate in the Auction must submit a Qualified Bid on or before [  ], 2009 at 5:00 p.m. (Eastern) (the "Bid Deadline") in writing, to: (i) the Debtors, 200 E Las Olas Blvd., Suite 1730, Ft. Lauderdale, FL 33301, Attn: Ronald Uyematsu; (ii) co-counsel to the Debtors, Moses & Singer LLP, The Chrysler Building, 405 Lexington Avenue, New York, NY 10174-1299, Attn: Alan E. Gamza, Esq. and Andrew P. Lederman, Esq., and Bayard, P.A., 222 Delaware

Avenue, Suite 900, P.O. Box 25130, Wilmington, DE 19899, Attn: Charlene Davis, Esq.; (iii) the Debtors' Chief Restructuring Advisor, RAS Management Advisors, LLC, 599 Ocean Avenue, Newport, RI 02840, Attn: Richard A. Sebastiao; (iv) the Debtors' investment banker, Venturi & Company LLC, 345 Lorton Avenue, Suite 105, Burlingame, CA 94010, Attn: Matthew B. Venturi; (v) counsel to the Committee, if and when appointed; (vi) co-counsel to the DIP Agent, Paul, Hastings, Janofsky & Walker, LLP, Park Avenue Tower, 75 E. 55th Street, First Floor, New York, NY 10022, Attn: Kristine M. Shryock, Esq., and Richards Layton & Ginger, P.A., 920 North King Street, Wilmington, Delaware 19801, Attn: Mark D. Collins, Esq. and Paul N. Heath, Esq.; (vii) counsel to Garrison Funding 2008-1 Ltd. ("Garrison"), Proskauer Rose LLP, One International Place, Boston, MA 02110-2600, Attn: William P. Brady, Jr., Esq.; and (viii) counsel to Monroe, Winston & Strawn LLP, 35 W. Wacker Drive, Chicago, IL 60601-9703, Attn: Brendan J. Geary, Esq.

The Debtors shall announce the terms of the highest or otherwise best Qualified Bid, after consultation with representatives of the DIP Agent, the First Lien Lenders, Garrison, Monroe and Committee, at or before the commencement of the Auction.

(c)     The Auction.  In the event that the Debtors receive any additional Qualified Bids by the Bid Deadline, an auction with respect to the Sale (the "Auction") will be conducted at the offices of Moses & Singer LLP, The Chrysler Building, 405 Lexington Avenue, New York, New York 10174, tentatively commencing at 10:00 a.m. (Eastern) on [ ] 2009 or such later time or other place as the Debtors notify all Qualified Bidders, the DIP Agent, First Lien Lenders, Garrison, Monroe, and the Committee.

(d)     Auction Procedures.

(i)      Only a Qualified Bidder, the DIP Agent, and the First Lien Lenders shall be eligible to participate at the Auction. Bidding shall commence with the highest or otherwise best Qualified Bid.

(ii)     The Purchaser and any Qualified Bidder (or its representative) wishing to participate in the Auction must appear in person or by phone (as may be allowed by the Debtors in their sole discretion) and submit its highest or otherwise best bid at the Auction (such bids submitted at the Auction, the "Auction Bids")

(iii)    Each Auction Bid must exceed the previous Auction Bid by a minimum value of $100,000 (the "Subsequent Minimum Overbid"); provided, however, that the Debtors reserve the right in their sole discretion, after consultation with counsel to the DIP Agent, the First Lien Lenders, Garrison, Monroe and the Committee, to adjust the Subsequent Minimum Overbid as

necessary in the best interests of their estates; provided, further, that the Purchaser shall be authorized to credit bid the Break-Up Fee and Expense Reimbursement throughout the Auction.

(iv) Bidding at the Auction will continue until such time as the Purchaser and each Qualified Bidder has submitted its highest or otherwise best bid, at which point the Auction shall close. The Debtors may employ and announce at the Auction additional procedural rules that are reasonable under the circumstances (e.g., the amount of time allotted to make Subsequent Bids) for conducting the Auction, provided that such rules are not inconsistent with these Bidding Procedures or applicable law.

(e) <u>No Combination Bidding</u>. Bidders may not form joint ventures or partnerships to submit bids with respect to the Sale, without the prior written consent of the Debtors (after consultation with representatives of the Committee, the DIP Agent, the First Lien Lenders, Garrison, and Monroe). Without limiting the generality of the foregoing, separate bidders may not combine their bids without the prior written approval of the Debtors (after consultation with representatives of the Committee, the DIP Agent, the First Lien Lenders, Garrison, and Monroe)

(f) <u>Selection of the Successful Bid</u>.

(i) The Debtors, in consultation with representatives of the DIP Agent, the First Lien Lenders, Garrison, Monroe, and the Committee, shall (i) review each Auction Bid on the basis of financial and contractual terms and the factors relevant to the Sale and (ii) identify the highest or otherwise best offer, in terms of net value to the Debtors' estates (the "Successful Bid" and the bidder making such bid, the "Successful Bidder")

(ii) The selection of a Successful Bidder shall be within the reasonable business judgment of the Debtors (after consultation with representatives of the Creditors' Committee, the DIP Agent, the First Lien Lenders, Garrison, and Monroe) and subject to the approval of the Bankruptcy Court, and economic considerations shall not necessarily be the sole criteria upon which the Debtors may base their decision. In assessing whether a proposal constitutes a higher or otherwise better offer, the Debtors shall be entitled to consider, among other things, the net economic effect upon the Debtors' estates.

(iii) The Debtors will sell the Assets to the Successful Bidder according to the terms of the Successful Bid upon the approval of such bid by the Bankruptcy Court after the Sale Hearing. The Debtors' presentation of a particular Qualified Bid to the Bankruptcy Court

for approval does not constitute the Debtors' acceptance of the bid. The Debtors will be deemed to have accepted a bid only when the bid has been approved by the Bankruptcy Court at the Sale Hearing.

(g) The Sale Hearing.

(i) The Sale Hearing will be held before the Honorable [ ] on [ ], 2009, at [ ] (Eastern) in the United States Bankruptcy Court for the District of Delaware, [ ], but may be adjourned or rescheduled in the Debtors' sole discretion, subject to Bankruptcy Court approval, as necessary, without further notice other than an announcement of the adjourned date at the Sale Hearing.

(ii) If the Debtors do not receive any Qualified Bids (other than the Qualified Bid of the Purchaser), the Debtors shall cancel the Auction and will report the same to the Bankruptcy Court at the Sale Hearing and shall proceed with a Sale to the Purchaser following entry of an order approving such Sale (the "Sale Approval Order") . If the Debtors do receive additional Qualified Bids, then, at the Sale Hearing, the Debtors may seek approval of the Successful Bid, as well as, in the Debtors' sole discretion, the second highest or otherwise best Qualified Bid (the "Alternate Bid," and the bidder making such bid, the "Alternate Bidder"). Following approval of the Sale to the Successful Bidder, if the Successful Bidder fails to consummate the Sale because of: (i) the failure of a condition precedent beyond the control of either the Debtors or the Successful Bidder or (ii) a breach or failure to perform on the part of such Successful Bidder, then the Alternate Bid will be deemed to be the Successful Bid and the Debtors will be permitted to effectuate a sale to the Alternate Bidder subject to the terms of the Alternate Bid without further order of the Bankruptcy Court.

(h) Return of Good Faith Deposit. As noted above, all Bidders will be required to submit good faith deposits (the "Good Faith Deposits") with the Debtors on or before the Bid Deadline. Such Good Faith Deposits shall be equal to $1 million. Good Faith Deposits of all Qualified Bidders shall be held in a separate account until a proposal is no longer irrevocable as provided herein, at which time they will be returned to the Qualified Bidder (the "Return Date"). Notwithstanding the foregoing, the Good Faith Deposit submitted by the Successful Bidder, together with interest thereon, if any, will be applied against the payment of the Purchase Price upon Closing of the Sale to the Successful Bidder. Subject to the preceding sentence, on the Return Date, the Debtors will return the Good Faith Deposits of all other Qualified Bidders, together with the accrued interest thereon, if any.

B.    Bid Protections

36.    By this Motion, the Debtors are also seeking approval of the Bid Protections to Butler America in accordance with the Agreement. In order to provide an incentive and to compensate Butler America for entering into the Agreement, the Debtors have agreed to the Break-Up Fee ($838,000, which is equal to three percent (3%) of the aggregate Purchase Price set forth in the Agreement; provided that if Butler America has not deposited the Second Deposit with the Escrow Holder, Butler America shall only be entitled to payment of an amount equal to 25% of the Break-Up Fee), and the Expense Reimbursement for reimbursement of its reasonable expenses, including (without limitation) attorneys and financial advisory fees and expenses,[6] not to exceed $150,000.

37.    The Break-Up Fee and Expense Reimbursement would be triggered upon the following events: (i) the Approval Order shall not have been entered by July 1, 2009; (ii) the Debtors withdraw any or all of the Purchased Assets from the Auction and Butler America exercises its right to terminate the Agreement in accordance with the terms of the Agreement, (iii) the Debtors cancel the Auction without Butler America's prior written consent; (iv) this Court enters an order approving the sale or other disposition of any or all of the Purchased Assets to a third party other than Butler America; provided, however, that the Bid Protections shall not be payable if Butler America is the Alternate Bidder, is obligated to close under and pursuant to the Alternate Bid, and closes; (v) the Debtors are unable to satisfy any of the Closing conditions set forth in section 4.2 of the Agreement and Butler America exercises its right to terminate the Agreement in accordance with the terms of the Agreement; (vi) the Debtors breach any provision of the Agreement, including (without limitation) any representation, warranty, or covenant and

---

[6]    For the avoidance of doubt, the fee and expense structures of PVB Advisors, LLC and Skadden, Arps, Slate, Meagher & Flom LLP shall be deemed reasonable.

Butler America exercises its right to terminate the Agreement in accordance with the terms of the Agreement; (vii) the Closing does not occur by the Outside Date; (viii) the Debtors terminate the Agreement for any reason other than as provided for in section 4.3.4. or 4.3.6. of the Agreement; or (ix) the Approval Order shall have been modified or amended without the consent of Butler America, reversed or stayed.

38. The Debtors believe that offering the Bid Protections to Butler America will benefit the Debtors' estates by establishing a floor and promoting more competitive bidding. Without such protections, bidding on the Purchased Assets would likely be reduced and the Debtors would not have certainty of a Sale to ensure administrative claims in the bankruptcy cases are paid and to provide value to their creditors. (The purchase price is tied to the loan balance under the DIP Credit Agreement, which provides for funding for projected administrative expenses.) The availability of the Break-Up Fee and Expense Reimbursement is necessary in order to provide Butler America with some assurance that it will be compensated for the time and expense it has spent in putting together its offer for the Purchased Assets and the risk that arises from subjecting its offer to higher and better offers at the Auction.

39. If earned, the Break-Up Fee and Expense Reimbursement would be paid from the first sale proceeds of any Sale consummated with an Alternative Bidder, or as an actual and necessary cost of preserving the Debtors' estates, within the meaning of section 503(b) of the Bankruptcy Code. If not paid from the proceeds of a Sale, the Bid Protections shall constitute superpriority administrative expenses with priority over any and all administrative expenses of the kind specified in Bankruptcy Code sections 503(b) or 507(b) or otherwise (other than any and all superpriority administrative expenses granted to the DIP Lenders and the First Lien Lenders, which shall be senior).

C.    Distribution of Sale Proceeds

40.    In order to keep the Debtors' business intact through the proposed sale process, it will be necessary for the Debtors to pay all post-petition expenses. In accordance with the DIP Credit Agreement and the calculation of the Purchase Price, if Butler America is the successful bidder, the Debtors have created a mechanism to pay accrued, but unpaid post-petition expenses at the time of the Closing consistent with their budget and provide for the ability to wind down the estate. The Debtors would draw down on the DIP Credit Agreement to fund certain accounts for such expenses. The Sale proceeds shall be disbursed in the following order: (a) an amount equal to the Bid Protections to Butler America to the extent the Bid Protections are due and owing and have not been paid, (b) an amount equal to the obligations under the DIP Credit Agreement to the DIP Agent, on behalf of the DIP Lenders, to pay all obligations indefeasibly in full in cash, including cash collateralization of all letters of credit in accordance with the terms of the DIP Credit Agreement, but only to the extent any issued and outstanding letters of credit are not otherwise assumed, reissued or replaced, (c) an amount equal to the obligations under the first lien credit facility, to the First Lien Agent, on behalf of the First Lien Lenders, to pay all obligations indefeasibly in full in cash, if any, with the remaining balance of the Sale proceeds to be remitted to the Debtors.

41.    By creating a mechanism for payment of expenses in connection with the Sale, the Debtors are preserving value for the estate and ensuring an orderly bankruptcy process after the Sale of the Purchased Assets.

D.  Notice of Bid Procedures, Auction and Sale

42.  The Debtors seek to schedule the Auction for June 25, 2009 at 10:00 a.m. Additionally, the Debtors seek to schedule the Sale Hearing on June 26, 2009 at 10:00 a.m., with an objection deadline prior to such hearing.

43.  Bankruptcy Rule 6004 provides that notice of a proposed sale of property outside the ordinary course pursuant to section 363(b) of the Bankruptcy Code must satisfy the requirements of Bankruptcy Rule 2002. Pursuant to Bankruptcy Rule 2002, as supplemented by Local Bankruptcy Rule 2002-1(b), the Debtors are required to notify their creditors of the Sale of the Purchased Assets, including disclosure of the time and place of the Auction, the terms and conditions of the Sale, and the deadline for filing any objections.

44.  In accordance with such rules, the Debtors (through their agent) propose to serve the Sale Notice, substantially in the form annexed hereto as Exhibit C, as follows: (I) within five (5) business days of entry of this Bidding Procedures Order (or as soon as reasonably practicable thereafter), by first-class mail, postage prepaid, upon (A) all entities reasonably known to have expressed an interest in a transaction with respect to the Assets during the past nine (9) months, (B) all entities reasonably known to have asserted any interest in the Assets, (C) the attorney generals for all fifty (50) states, all federal, state, and local regulatory or taxing authorities or recording offices, including (without limitation) the SEC, the EPA and all regional offices, state environmental protection agencies, the IRS, and the Department of Labor and similar state labor or employment agencies, (D) all parties entitled to notice Local Bankruptcy Rule 2002-1(b), and (E) all known or potential creditors, and (ii) the Debtors will publish a form substantially similar to the Sale Notice in the USA Today within five (5) business days of entry of the Bidding Procedure Order or as soon as practicable thereafter.

45.     In addition, the Debtors will post, among other things, this Motion, the Bidding Procedures Order, Bidding Procedures and Sale Notice on the website, www.donlinrecano.com/butler, maintained by the Debtors' claims noticing agent, Donlin, Recano & Company, Inc. The Sale Notice provides parties with the address for the Debtors' website and will inform them that additional information concerning these cases can be found at such website.

46.     The Debtors submit that such notice shall constitute good and sufficient notice of the Auction, the Sale and the Sale Hearing, and that no other or further notice need be given. Accordingly, the Debtors request that the Court approve the form and manner of the Sale Notice, substantially in the form annexed hereto as Exhibit C.

E.     Assumption and Assignment Notice Procedures For Assumed Contracts

47.     To facilitate the Sale and the assumption and assignment of the Contracts and Leases that Butler America designates, the Debtors propose the following procedures for notifying non-debtor counterparties to the Contracts and Leases of potential cure amounts in the event the Debtors decide to assume and assign such Contracts or Leases.

48.     Within five (5) business days after entry of the Bidding Procedures Order, the Debtors will serve a notice of cure amount (the "Cure Notice"), substantially in the form attached hereto as Exhibit F, upon all non-debtor counterparties to the Contracts and Leases listed in the schedule to be attached the Bidding Procedures Order (the "Cure Schedule"), which will state the cure amounts that the Debtors believe are necessary to assume such Contracts and Leases pursuant to section 365 of the Bankruptcy Code (the "Undisputed Cure Amount").

49.     The Cure Notice will notify the non-debtor counterparty that the Contract or Lease may be assumed and assigned to a purchaser of the Purchaser Assets to be identified at the conclusion of the Auction. The Cure Notice will inform the non-debtor counterparty that if it

disagrees with the Undisputed Cure Amount set forth therein, it must file a formal objection that complies with the Bidding Procedures Order (the "Cure Objection") by the deadline set forth in the Cure Notice the (the "Cure Objection Deadline"). The Debtors request that the Court set the Cure Objection Deadline to be 4:00 p.m. on a day that is not more than eight (8) days after service of the Cure Notice.

50.     The Cure Notice will further inform the non-debtor counterparty that (a) unless it files with the Bankruptcy Court a Cure Objection the Cure Objection Deadline, and (b) serves a copy of such Cure Objection so as to be received no later than the Cure Objection Deadline on: (i) the Debtors, 200 E Las Olas Blvd., Suite 1730, Ft. Lauderdale, FL 33301, Attn: Ronald Uyematsu; (ii) co-counsel to the Debtors, Moses & Singer LLP, The Chrysler Building, 405 Lexington Avenue, New York, NY 10174-1299, Attn: Alan E. Gamza, Esq. and Andrew P. Lederman, Esq., and Bayard, P.A., 222 Delaware Avenue, Suite 900, P.O. Box 25130, Wilmington, DE 19899, Attn: Charlene Davis, Esq.; (iii) the Office of the United States Trustee, 844 King Street, Room 2313, Wilmington, DE 19801, Attn: Thomas P. Tinker, Esq.; (iv) counsel to the Committee, if and when appointed; (v) co-counsel to the DIP Agent, Paul, Hastings, Janofsky & Walker, LLP, Park Avenue Tower, 75 E. 55th Street, First Floor, New York, NY 10022, Attn: Kristine Shryock, Esq., and Richards Layton & Finger, P.A., 920 North King Street, Wilmington, DE 19801, Attn: Mark D. Collins, Esq. and Paul N. Heath Esq., (vi) counsel to the Purchaser, Skadden, Arps, Slate, Meagher & Glom, LLP, One Rodney Square, Wilmington, DE 19801, Attn: Ian S. Fredericks, Esq.; (vii) counsel to Garrison, Proskauer Rose LLP, One International Place, Boston, MA 02110-2600, Attn: William P. Brady, Jr., Esq.; and (viii) counsel to Monroe, Winston & Strawn LLP, 35 W. Wacker Drive, Chicago, IL 60601-9703, Attn: Brendan J. Geary, Esq., such non-debtor counterparty will be (i) deemed to have

agreed that the Undisputed Cure Amount constitutes the amount necessary under Bankruptcy Code section 365(b)(1)(A) and (B) and 365(f)(2)(A) to cure all defaults and pay all actual pecuniary losses under the applicable executory contract or unexpired lease, (ii) barred from asserting a different amount necessary under Bankruptcy Code section 365(b)(1)(A) and (B) and 365(f)(2)(A) to cure all defaults and pay all actual pecuniary losses under such contracts or leases, and (iii) deemed to have waived its right to collect additional amounts under such contracts or leases for any pre-petition period.

51.     In the event that a Cure Objection is filed, such objection must set forth with specificity (i) the basis for the objection, and (ii) the amount the party asserts as the proper cure amount (the "Asserted Cure Amount"). After receipt of the Cure Objection, Butler America with the Debtors assistance will attempt to reconcile any differences between the Undisputed Cure Amount and Asserted Cure Amount (the "Disputed Cure Amount") for any Contract or Lease that is designated to be an Assumed Contract. In the event the parties cannot resolve the Cure Objection, and the Court does not otherwise make a determination at the Sale Hearing, Butler America will escrow or otherwise secure payment of any Disputed Cure Amounts for any Assumed Contracts pending the resolution of any such disputes by this Court or mutual agreement of the parties. The Cure Notice shall also provide that objections to any Cure Amount will be heard at the Sale Hearing or at a later hearing, as determined by the Debtors.

52.     As soon as possible after the conclusion of the Auction, the Debtors shall file with the Bankruptcy Court a notice that identifies the Successful Bidder and designates those Contracts and Leases that the Debtors will seek to assume and assign at the Sale Hearing.

53.     At the Sale Hearing, the Debtors shall (i) present evidence necessary to demonstrate adequate assurance of future performance by the Successful Bidder, and (ii) request

entry of an order requesting approval of the assumption and assignment of any Assigned Contracts to any Successful Bidder.

      F.    <u>The Sale Hearing</u>

54.    The Debtors request that the Court schedule the Sale Hearing on June 26, 2009 at 10:00 a.m. (Eastern), or as soon thereafter as counsel may be heard, to consider entry of the Approval Order authorizing the Sale of the Purchased Assets and approving the Agreement or modified Agreement submitted by a Successful Bidder other than Butler America, as the case may be, in accordance with the Bidding Procedures.

55.    The Debtors further request that any responses or objections to the relief to be considered at the Sale Hearing, including, but not limited to, the Debtors' request to approve the Sale of the Purchased Assets, (a) be in writing, (b) comply with the Bankruptcy Rules and the Local Bankruptcy Rules, and (c) be filed with the clerk of the Bankruptcy Court for the District of Delaware, Third Floor, 824 North Market Street, Wilmington, DE 19801; and served upon (i) the Debtors, 200 E Las Olas Blvd., Suite 1730, Ft. Lauderdale, FL 33301, Attn: Ronald Uyematsu; (ii) co-counsel to the Debtors, Moses & Singer LLP, The Chrysler Building, 405 Lexington Avenue, New York, NY 10174-1299, Attn: Alan E. Gamza, Esq. and Andrew P. Lederman, Esq., and Bayard, P.A., 222 Delaware Avenue, Suite 900, P.O. Box 25130, Wilmington, DE 19899, Attn: Charlene Davis, Esq.; (iii) the Office of the United States Trustee, 844 King Street, Room 2313, Wilmington, DE 19801, Attn.: Thomas P. Tinker, Esq.; (iv) counsel to the Committee, if and when appointed; (v) co-counsel to the DIP Agent, Paul, Hastings, Janofsky & Walker, LLP, Park Avenue Tower, 75 E. 55th Street, First Floor, New York, NY 10022, Attn: Kristine Shryock, Esq., and Richards Layton & Finger, P.A., 920 North King Street, Wilmington, DE 19801, Attn: Mark D. Collins, Esq. and Paul N. Heath, Esq., and (vi) counsel to the Purchaser, Skadden, Arps, Slate, Meagher & Glom, LLP, One Rodney

Square, Wilmington, DE 19801, Attn: Ian S. Fredericks, Esq.; (vii) counsel to Garrison,

Proskauer Rose LLP, One International Place, Boston, MA 02110-2600, Attn: William P. Brady,

Jr., Esq.; and (viii) counsel to Monroe, Winston & Strawn LLP, 35 W. Wacker Drive, Chicago,

IL 60601-9703, Attn: Brendan J. Geary, Esq.; and (ix) any party requesting notice pursuant to

Rule 2002 of the Bankruptcy Rules and Rule 2002-1 of the Local Bankruptcy Rules, so as to be

received no later than 4:00 p.m. (Eastern) on or before June 19, 2009 (the "Objection Deadline").

## AUTHORITY FOR REQUESTED RELIEF

A.  The Bidding Procedures Are Fair And Are Designed To Maximize The Value Of
    The Purchased Assets

56.  Pursuant to Bankruptcy Rule 6004(f)(1), sales of property outside the ordinary

course of business may be by private sale or by public auction. The Debtors believe a sale of the

Purchased Assets subject to the Auction governed by the proposed Bidding Procedures will

maximize the sale proceeds received by the estate, which is the paramount goal in any proposed

sale of property of the estate. *In re Dura Automotive Sys., Inc.,* 2007 Bankr. LEXIS 2764, at

*253 (Bankr. D. Del. 2007) ("The paramount goal in any proposed sale of property of the estate

is to maximize the proceeds received by the estate.") (citations omitted).

57.  The proposed Bidding Procedures allow the Debtors to conduct the Auction in a

controlled, fair, and open fashion that will encourage participation by financially capable

bidders, thereby increasing the likelihood that the Debtors will receive the best possible

consideration for the Purchased Assets.  Where such procedures provide a benefit to the estate by

maximizing the value of the assets and enhance competitive bidding, they should be approved.

*Id.* citing *Calpine Corp. v, O'Brien Envt'l Energy, Inc., (In re O'Brien Envt'l Energy, Inc.)* 181

F.3d 527, 535-37 (3d Cir. 1999) (detailing situations where bidding incentives are appropriate in

bankruptcy because they provide a benefit to the estate).

58.     Although the Debtors believe that the value to be provided pursuant to the terms set forth in the Agreement is fair and reasonable, the Debtors submit that the Bidding Procedures and the Auction will ensure that the Debtors' estates receive the highest or best value available by allowing the market to test the purchase price of the Purchased Assets.  The Bidding Procedures are structured so that potential purchasers may bid on the Purchased Assets and attract the greatest number of competing bids. The Debtors request the Court's approval of the process and procedures set forth in the Bidding Procedures for the submission and consideration of competing bids from other interested parties for the Purchased Assets.

B.     The Bid Protections Are Necessary To Preserve The Value Of The Debtors' Estates

59.     As set forth in the summary of the Agreement, if, among other things, the Debtors consummate the Sale of the Purchased Assets to any entity or entities other than the Purchaser, the Debtors shall, subject to the Bankruptcy Court approvals, pay Butler America the Break-Up Fee and Expense Reimbursement.  In the Third Circuit, whether a court may approve such fees and expenses is governed be section 503 of the Bankruptcy Code.  *O'Brien*, 181 F.3d at 527.

60.     In *O'Brien*, the Third Circuit found that, whether break-up fees and expenses could be paid to the stalking horse, depended on whether such fees were necessary to preserve the value of the estate. *Id.* at 536.  The Third Circuit further clarified that whether such fees and expenses were necessary to preserve the value of the estate depended on whether it provided a benefit to the estate by promoting competitive bidding or researching the value of the assets at issue to increase the likelihood that the selling price reflected the true value of the company. *Id.* at 537. The Debtors believe that Butler America, acting as a stalking horse, will create a competitive bidding process.

61.     The Debtors' believe that the foregoing bid protections are justified because the Purchaser is providing a substantial benefit to the estate by acting as the Stalking Horse Bidder for the Purchased Assets. By acting as a "stalking horse," the Purchaser's bid has set a floor by which other bids may be judged. The Debtors will incur the obligation to pay the Break-Up Fee and Expense Reimbursement only in limited circumstances, including, among other things, if the proposed auction process produces a competing bid from a third party that constitutes a higher or better offer and is subsequently approved by the Court.

C.      The Purchased Assets May Be Sold Pursuant To Section 363(b) Of The Bankruptcy Code

62.     Section 363(b)(1) of the Bankruptcy Code provides, in relevant part, that "[t]he trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1). Although section 363 of the Bankruptcy Code does not specify a standard for determining when it is appropriate for a court to authorize the use, sale or lease of property of the estate, bankruptcy courts routinely authorize sales of a debtor's assets if such sale is based upon the sound business judgment of the debtor. *Dura Automotive*, 2007 Bankr. LEXIS 2764 at * 258, citing *Myers v. Martin (In re Martin)*, 91 F.3d 389, 395 (3d Cir. 1996); *Comm. of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.)*, 722 F.2d 1063, 1070 (2d Cir. 1983); *In re Abbotts Dairies of Pa., Inc.*, 788 F.2d 143 (3d Cir. 1986) (implicitly adopting the "sound business judgment" test of *Lionel Corp.* and requiring good faith); *In re Delaware and Hudson Ry. Co.*, 124 B.R. 169 (D. Del. 1991) (concluding that the Third Circuit adopted the "sound business judgment" test in the *Abbotts Dairies* decision); *In re Montgomery Ward Holding Corp.*, 242 B.R. 147, 153 (D. Del. 1999) (same).

63.     In the circumstances of valid business justifications, applicable principles of law attach to a debtor's decision a strong presumption "that in making a business decision[,] the

directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company." *Official Comm. of Sub. Bondholders v. Integrated Res., Inc. (In re Integrated Res., Inc.)*, 147 B.R. 650, 656 (S.D.N.Y. 1990) (holding that the Delaware business judgment rule has "vitality by analogy" in chapter 11, especially where the debtor is a Delaware corporation) (quotations omitted). In this District, once a court is satisfied that there is a sound business justification for the proposed sale, the court must then determine whether (i) the debtor in possession has provided the interested parties with adequate and reasonable notice, (ii) the sale price is fair and reasonable, and (iii) the purchaser is proceeding in good faith. *Delaware and Hudson*, 124 B.R. at 166; *accord. In re Decora Indus., Inc.*, 2002 WL 32332749, at *3 (Bankr. D. Del. 2002).

64.     Further, section 105(a) of the Bankruptcy Code provides a bankruptcy court with broad powers in the administration of a case under the Bankruptcy Code: "[t]he court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of [the Bankruptcy Code]." 11 U.S.C. § 105(a). Provided that a bankruptcy court does not employ its equitable powers to achieve a result not contemplated by the Bankruptcy Code, the exercise of its Section 105(a) power is proper. *In re Fesco Plastics Corp.*, 966 F.2d 152, 154 (7th Cir. 1993); *Pincus v. Graduate Loan Ctr. (In re Pincus)*, 280 B.R. 303, 312 (Bankr. S.D.N.Y. 2002). Pursuant to Section 105(a), a court may fashion an order or decree that helps preserve or protect the value of a debtor's assets. *See, e.g., Chinichian v. Campolongo (In re Chinichian)*, 784 F.2d 1440, 1443 (9th Cir. 1986) ("Section 105 sets out the power of the bankruptcy court to fashion orders as necessary pursuant to the purposes of the Bankruptcy Code."); *In re Cooper Props., Liquidating Trust, Inc.*, 62 B.R. 531, 537 (Bankr. .D. Tenn. 1986) (noting that bankruptcy court is "one of equity and as such it has a duty to protect whatever equities a debtor may have in

property for the benefit of its creditors as long as hat protection is implemented in a manner consistent with the bankruptcy laws.").

65.     The Debtors respectfully submit that the decision to enter into the Agreement and sell the Purchased Assets is based upon their sound business judgment and should be approved. In addition, the Sale is appropriate in these chapter 11 cases and is well within the Court's equitable powers under section 105(a) of the Bankruptcy Code.  Saddled with over $40,000,000 million in secured indebtedness, a decline in customer demand, continued operating losses and a lack of liquidity, the Debtors have determined that the Sale of the Purchased Assets is in the best interests of all stakeholders.

66.     In addition, the Debtors believe their comprehensive pre-petition marketing efforts, arms'-length negotiations with Butler America, and the proposed Bidding Procedures will achieve the best results for their estates and maximize the value of the Purchased Assets. Furthermore, the Bidding Procedures contemplate an open auction process with minimum barriers to entry, and are designed to ensure that the ultimate purchase price of the Purchased Assets is fair and reasonable. Thus, the Debtors submit that the sale of the Purchased Assets is within their business judgment.

D.      The Purchased Assets May Be Sold Free And Clear Of All Interests Pursuant To Section 363(f) Of The Bankruptcy Code

67.     The Third Circuit has held that the authority of a debtor to sell assets free and clear of interests is broad and should be read expansively. *In re TWA, Inc.*, 322 F.3d 283, 289 (3d Cir. 2003).  Moreover, the purpose of the "free and clear" language is to allow the debtor to obtain a maximum recovery on its assets in the marketplace. *In re TWA, Inc.*, 2001 Bankr. LEXIS 723, at *8-*10 (Bankr. D. Del. Mar. 27, 2001).  To maximize the value of the Purchased Assets the Debtors must be able to sell such assets free and clear of all Interests.

68.     Pursuant to Section 363(f) of the Bankruptcy Code, a debtor may sell property

free and clear of liens, claims and encumbrances if one of the following conditions is satisfied:

> (1)     applicable nonbankruptcy law permits sale of such property free and clear of such interest;
>
> (2)     such entity consents;
>
> (3)     such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property;
>
> (4)     such interest is in bona fide dispute; or
>
> (5)     such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

11 U.S.C. § 363(f).  Section 363(f) permits the sale of estate property free and clear of interests if

any one of the five conditions above is met because that section is written in the disjunctive.

*Dura Automotive,* 2007 Bankr. LEXIS 2764 at * 264.  Because the Debtors expect that they will

satisfy the second and fifth of these requirements, if not others as well, approving the sale of the

Purchased Assets free and clear of all interests is warranted.  Any bona fide and allowed Interest

shall attach to the sale proceeds with the same force, validity, effect, priority and enforceability

as such Interests had in the Assets prior to the Sale.

69.     In light of the Intercreditor Agreement, Section 363(f) will be satisfied and the

Debtors should be permitted to sell the Purchased Assets free and clear of all liens, claims,

encumbrances and interests.

E.     The Successful Bidder Should Be Afforded Protections Under Section 363(m) Of The Bankruptcy Code As A Good Faith Purchaser

70.     Section 363(m) of the Bankruptcy Code protects the sale of a debtor's property to

a good faith purchaser:

> The reversal or modification on appeal of an authorization under subsection (b) or (c) of this section of a sale or lease of property

> does not affect the validity of a sale or lease under such authorization to an entity that purchased or leased such property in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and such sale or lease were stayed pending appeal.

11 U.S.C. § 363(m). Although the Bankruptcy Code does not define "good faith," the Court of Appeals for the Third Circuit has noted that the phrase "encompasses one who purchases in 'good faith' and 'for value.'" *Abbotts Dairies,* 788 F.2d at 147. Further, the Third Circuit has recognized that the type of misconduct that would destroy a purchaser's good faith status involves "'fraud, collusion between the purchaser and other bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders.'" *Id.* (remanding case involving insider transaction back to the bankruptcy court for further consideration of good faith where there was evidence that the sale had been orchestrated between insiders and some of the sale conditions were not disclosed to the debtor's creditors) (quoting *In re Rock Indus. Mach. Corp.,* 572 F.2d 1195, 1198 (7th Cir. 1978)).

71.     As will be further demonstrated at the Sale Hearing, the sale of the Purchased Assets to Butler America was proposed in good faith as a result of arms'-length negotiations between the Debtors and Butler America. The sale of the Purchased Assets to the Purchaser is subject to higher or better offers pursuant to the Bidding Procedures, which are designed not only to solicit potential competing bidders, but to ensure that no party is able to exert undue influence over the auction process. Under such circumstances, the Debtors submit that the Purchaser or the Successful Bidder, if the Successful Bidder is not the Purchaser, should be afforded the protections that section 363(m) of the Bankruptcy Code provides to a good faith purchaser.

F.      Assumption And Assignment Of Assumed Contracts

72.     To facilitate and effect the sale of the Purchased Assets, the Debtors also seek authority to assume and assign certain contracts and leases to the purchaser of the Purchased

Assets. Section 365 allows the debtor in possession to "maximize the value of the debtor's estate" by assuming executory contracts or unexpired leases that "benefit the estate" and by rejecting those that do not. *Cinicola,* 248 F.3d at 119 (quotations omitted); *COR Route 5 Co., LLC v. The Penn Traffic Co. (In re The Penn Traffic Co.),* 524 F.3d 373, 382 (2d Cir. 2008). Section 365 of the Bankruptcy Code authorizes the proposed assumptions and assignments, provided that the defaults under such contracts and leases are cured and adequate assurance of future performance is provided. *See* 11 U .S.C. § 365(f)(2).

73.     The words "adequate assurance of future performance" must be given a "practical, pragmatic construction" in "light of the proposed assumption." *In re Fleming Cos.,* 499 F.3d 300 (3d Cir. 2007) *(quoting Cinicola,* 248 F.3d at 120 n. 10); *see also Carlisle Homes, Inc. v. Arrari (In re Carlisle Homes, Inc.),* 103 B.R. 524, 538 (Bankr. D.N.J. 1989) (same); *In re Nalco Indus., Inc.,* 54 B.R. 436, 440 (Bankr. S.D.N.Y. 1985) (adequate assurance of future performance does not mean absolute assurance that debtor will thrive and pay rent); *In re Bon Ton Rest. & Pastry Shop, Inc.,* 53 B.R. 789, 803 (Bankr. N.D. Ill. 1985) ("Although no single solution will satisfy every ease, the required assurance will fall considerably short of an absolute guarantee of performance.").

74.     Among other things, adequate assurance may be given by demonstrating the assignee's financial health and experience in managing the type of enterprise or property assigned. *See In re Bygaph, Inc.,* 56 B.R. 596, 605-06 (Bankr. S.D.N.Y. 1986) (adequate assurance of future performance is present when prospective assignee of a lease from debtor has financial resources and has expressed a willingness to devote sufficient funding to business in order to give it strong likelihood of succeeding; chief determinant of adequate assurance is whether rent will be paid); *see also In re Vitanza,* 1998 WL, 808629, at *26 (Bankr. E.D. Pa.

1998) ("The test is not one of guaranty but simply whether it appears that the rent will be paid and other lease obligations met.").

75.     As set forth above, to submit a bid, an entity cannot have any financing contingency. In addition, the Debtors believe that Butler America has sufficient capital and financing commitments to provide adequate assurance of future performance of any contracts or leases. Further, at the Sale Hearing, the Debtors will provide evidence, if necessary, that all requirements for the assumption and assignment of Assumed Contracts to the Purchaser or other Successful Bidder will be satisfied.

76.     The Debtors respectfully submit that the proposed assumption and assignment procedures are appropriate and reasonably tailored to provide non-debtor counterparties executory contracts and unexpired leases with adequate notice the Undisputed Cure Amount and potential assumption and assignment of such contract or lease. Such counterparties will then be given an opportunity to file a Cure Objection. If a Cure Objection is filed, such objection will be heard at the Sale Hearing or at a later hearing.

G.     Waiver Of Bankruptcy Rules 6004(h) and 6006(d) is Appropriate

77.     To successfully implement the foregoing, the Debtors seek a waiver of the ten-day stay under Bankruptcy Rules 6004(h) and (d). Bankruptcy Rule 6004(h) provides that an "order authorizing the use, sale or lease of property . . . is stayed until the expiration of 10 days after entry of the order, unless the court orders otherwise." Similarly, Bankruptcy Rule 6006(d) provides that an "order authorizing the trustee to assign an executory contract or unexpired lease . . . is stayed until the expiration of 10 days after the entry of the order, unless the court orders otherwise."

78.     The Debtors respectfully request that the Court waive the ten-day stays of Bankruptcy Rules 6004(h) and 6006(d) with respect to both the Bidding Procedures Order and

Approval Order. By waiving such requirements, the Debtors will be able to immediately implement without any uncertainty the sale process described in this Motion and any Successful Bidder will be able to immediately close after the Sale Hearing, which will in turn minimize costs and benefit the benefit the Debtors' estates.

79.     Accordingly, the Debtors hereby request that the Court waive the 10-day stay period under Bankruptcy Rules 6004(h) and 6006(d).

## NOTICE

80.     In accordance with Local Bankruptcy Rules 2002-1(b) and 9013-1, notice of this Motion has been provided to (i) the Office of the United States Trustee for the District of Delaware, (ii) the Debtors' 30 largest unsecured creditors (on a consolidated basis), (iii) counsel to Butler America, (iv) counsel for GECC, (v) counsel for Monroe, (vi) counsel for Garrison, (vii) all parties who have filed a request for notice under Bankruptcy Rule 2002(i), and (viii) any other party whose rights are directly affected by the Motion. A copy of the Sale Notice (with a note indicating the dates that the Debtors are requesting) is also being served at this time upon the parties listed in subsections (i) and (ii) immediately below. The Bidding Procedures Order (after its entry) and the Sale Notice will be provided to (i) all entities reasonably known to have expressed an interest in a transaction with respect to the Assets during the past nine (9) months, (ii) all entities reasonably known to have asserted any interest in the Assets, (iii) the attorney generals for all fifty (50) states, all federal, state, and local regulatory or taxing authorities or recording offices, including (without limitation) the SEC, the EPA and all regional offices, state environmental protection agencies, the IRS, and the Department of Labor and similar state labor or employment agencies, (iv) all parties entitled to notice Local Bankruptcy Rule 2002-1(b), and (v) all known or potential creditors. Due to the urgency of the circumstances surrounding this

Motion and the nature of the relief requested herein, the Debtors respectfully submit that no further notice of this Motion is required.

## NO PREVIOUS REQUEST

81.     No previous request for the relief sought herein has been made to this or any other court.

WHEREFORE the Debtors respectfully request (i) entry of the Bidding Procedures Order, substantially in the form attached hereto as Exhibit A (ii) entry of the Approval Order, substantially in form attached hereto as Exhibit E, and (iii) such other and further relief as the Court deems just and proper.

Dated: Wilmington, Delaware
     June 1, 2009

Charlene D. Davis Esq. (CD- 2336)
Bayard, P.A.
222 Delaware Avenue
Suite 900
Wilmington, DE 19801
Phone: (302) 655-5000
Fax: (302) 658-6395

- and -

Alan E. Gamza (AG-2014)
(*Pro Hac Vice* Admission Pending)
Andrew P. Lederman  (AL-4108)
(*Pro Hac Vice* Admission Pending)
MOSES & SINGER LLP
The Chrysler Building
405 Lexington Avenue
New York, NY 10174
Tel: (212) 554-7800
Fax: (212) 554-7700

Proposed Attorneys for Debtors and
Debtors in Possession